**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JENNIFER SMITH, et al., | Case No. 1:13-cv-2018 |
| Plaintiffs, | |
| v. | Hon. Amy J. St. Eve |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al. | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CERTIFICATION OF A CLASS AND**
**SUBCLASS PURSUANT TO FED. R. CIV. P. 23(b)(3), 23(b)(1), AND/OR 23(c)(4)**

1271132.9

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.    BACKGROUND ................................................................ 4

    A.    The Telephone Consumer Protection Act...................................... 4

    B.    Variable's Automated Call Practices ............................................ 6

    C.    Lead Transfers to State Farm Agents............................................ 7

    D.    State Farm Allowed its Agents to Use Variable and Ratified their Contracts through Direct Contact. .......................... 9

        1.    State Farm Relied on its "Exclusive Agency Relationship" with its Agents to Make Telemarketing Calls to Consumers. .................................. 9

        2.    State Farm Encouraged its Agents and Employees to Use Telemarketing Vendors, Allowing Over 500 of Them to Use Non-Approved Variable........................ 11

        3.    State Farm Ratified its Agents' Contracts with Variable through Direct Contacts with Variable. ............ 13

    E.    Background of Plaintiffs' Claims ................................................ 14

        1.    Plaintiff Jennifer Smith .................................................. 14

        2.    Plaintiff Shawn Matejovich ............................................ 15

III.    LEGAL STANDARD ........................................................ 15

IV.    ARGUMENT ................................................................ 17

    A.    The Proposed Class .................................................................... 17

    B.    The Class Representatives Have Standing.................................. 18

    C.    The Proposed Class is Ascertainable. ........................................ 18

    D.    The Requirements of Rule 23(a) Are Met. ................................. 21

        1.    The Proposed Class is Sufficiently Numerous................. 21

        2.    The Proposed Class Involves Common Issues of Law and Fact.................................................................. 21

        3.    Plaintiffs' Claims Are Typical of Those of the Class.............................................................................. 23

        4.    Plaintiffs and their Counsel are Adequate. ...................... 24

    E.    The Rule 23(b)(3) Requirements Are Satisfied. .......................... 25

        1.    Common Issues Predominate........................................... 25

# TABLE OF CONTENTS
(continued)

**Page**

2.     A Class Action Is the Superior Method of Adjudicating the Claims of the Class Members. ............. 29

F.     Certification Under Rule 23(b)(1) and/or 23(c)(4) Is Appropriate. ................................................. 31

V.     APPOINTMENT OF CLASS COUNSEL ............................................. 32

VI.     CONCLUSION ........................................................................ 33

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alea London Ltd. v. Am. Home Servs., Inc.*,
638 F.3d 768 (11th Cir. 2011) ......................................................................... 5

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......................................................................... 16, 24, 25

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) .................................................................................. 26

*Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*,
*leave to appeal denied* 747 F.3d 489 (7th Cir. 2014) ................................... 16

*Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*,
No. 09-c-07299, 2014 WL 540250 (N.D. Ill. 2014) ..................................... 16

*Balschmiter v. TD Auto Finance, LLC*,
303 F.R.D. 508 (E.D. Wisc. 2014) ............................................................... 27

*Bee, Denning, Inc. v. Capital Alliance Group*,
2015 U.S. Dist. LEXIS 129495 (S.D. Cal. Sept. 24, 2015) .......................... 30

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014) .................................................... 16, 20, 24, 25

*Booth v. Appstack, Inc.*,
2015 U.S. Dist. LEXIS 40779 (W.D. Wash. Mar. 29, 2015) ......................... 6

*Butler v. Sears, Roebuck and Co.*,
702 F.3d 359 (7th Cir. 2012), *vac'd on other grounds*, 133 S. Ct. 2768 (2013) .......... 25

*Butler v. Sears, Roebuck and Co., judgment reinstated*,
727 F.3d 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014) ........................... 26

*Chicago Teachers Union, Local 1 v. Board of Educ. of the City of Chicago*,
307 F.R.D. 475 (N.D. Ill. 2015) ................................................................... 23

*Cicilline v. Jewel Food Stores, Inc.*,
542 F. Supp. 2d 831 (N.D. Ill. 2008) ........................................................... 29

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
No. 07 C 5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) ..................... 22

*Gomez v. St. Vincent Health, Inc.*,
649 F.3d 583 (7th Cir. 2011) ........................................................................ 24

*Gulf Oil Co. v. Bernard*,
452 U.S. 89 (1981) ........................................................................................ 16

*Hinman v. M and M Rental Center*,
545 F. Supp. 2d 802 (N.D. Ill. 2008) ...................................................... 23, 29

## TABLE OF AUTHORITIES

(continued)

*In re IKO Roofing Shingle Products Liab. Litig.*,
  757 F.3d 599 (7th Cir. 2014) ........................................................ 32

*Indiana Bell Tel. Co. v. McCarty*,
  362 F.3d 378 (7th Cir. 2004) .......................................................... 6

*Ira Holtzman, C.P.A., & Assocs. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ..................................................... 2, 16

*Jamie S. v. Milwaukee Pub. Sch.*,
  668 F.3d 481 (7th Cir. 2012) ........................................................ 16

*Keele v. Wexler*,
  149 F.3d 589 (7th Cir. 1998) ........................................................ 23

*Kleen Products LLC v. International Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015) ........................................ 17, 21, 29

*Kohen v. Pacific Inv. Management Co., LLC*,
  571 F.3d 672 (7th Cir. 2009) ........................................................ 16

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  672 F.3d 482 (7th Cir. 2012) ........................................................ 32

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .................................................. 17, 29

*Mims v. Arrow Fin. Servs. LLC*,
  132 S. Ct. 740 (2012) .................................................................... 4

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) .................................... 17, 18, 19, 30

*Muro v. Target Corp.*,
  580 F.3d 485 (7th Cir. 2009) ........................................................ 24

*Nigro v. Merchantile Adjustment Bureau, LLC*,
  No. 13-1362 (2d Cir. June 30, 2014) .............................................. 5

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) .................................................. 17, 23

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) ...................................................... 21

*Pella Corp. v. Saltzman*,
  606 F.3d 391 (7th Cir. 2010) .................................................. 22, 32

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*,
  281 F.R.D. 327 (E.D. Wis. 2012) .................................................. 29

*Riley v. California*,
  134 S. Ct. 2473 (2014) .................................................................. 5

*Savanna Group, Inc. v. Trynex, Inc.*,
  2013 U.S. Dist. LEXIS 1277 (N.D. Ill. Jan. 4, 2013) .............. 21, 23, 24

## TABLE OF AUTHORITIES
(continued)

**Page**

*Smith v. State Farm Mut. Auto. Ins. Co.*,
   2015 U.S. Dist. LEXIS 5231 (N.D. Ill. Jan. 13, 2015) ............................... 14, 20, 25, 32

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ..................................................... 17, 21, 22, 26

*Wal–Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)............................................................... 22, 26

## STATUTES

47 U.S.C.
   § 227 .......................................................................................... 4
   § 227 *et seq.* ................................................................................ 1
   § 227(b)(1)(A)(iii)........................................................................ 4
   § 227(b)(2) .................................................................................. 5

## RULES

Fed. R. Civ. P.
   1 .............................................................................................. 29
   23(a)................................................................................... 2, 15, 17
   23(a)(2) ............................................................................. 22, 23, 26
   23(a)(3) .................................................................................. 23, 24
   23(a)(4) ...................................................................................... 24
   23(b)........................................................................................... 15
   23(g)............................................................................................ 2
   23(g)(1) ...................................................................................... 32

## TREATISES

*Newberg on Class Actions* § 4:24 (5th ed. 2012).............................................. 31

Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010) ...................................... 16

## OTHER AUTHORITY

105 Stat. 2394 ........................................................................................ 4, 5

Advisory Committee Notes, Rule 23(b)(1)......................................................... 31

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991*, 30 FCC Rcd. 7961, 30 F.C.C.R. 7961 (F.C.C. 2015).............. 6

*In The Matter of Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991: Request of State Farm for Clarification and Declaratory
Ruling,* 20 FCC Rcd 13664 (FCC 2005)........................................................ 10

1271132.9

**TABLE OF AUTHORITIES**

(continued)

**Page**

*State Farm Mutual Automobile Insurance Company's Request for Clarification & Declaratory Ruling,* CG Docket No. 02-278, (May 13, 2005) ........................... 9, 10, 11

I.    **INTRODUCTION**

Defendant Variable Marketing, LLC ("Variable") made many millions of prerecorded telemarketing calls to cellular telephones in 2012 and 2013; it literally cold-called numbers it found in the White Pages. Variable's call recording instructed recipients to "press 1 now" for a better deal on auto insurance. Recipients who pressed 1 were transferred to a live Variable "screener," who asked questions and entered the recipient's answers into a database. Variable attempted to "warm transfer" such calls to insurance agents, including insurance agents for Defendant State Farm Mutual Automobile Insurance Company ("State Farm").[1] These transfers were no surprise to State Farm (or its agents): State Farm executives recommended Variable's services to State Farm agents and tracked the number of leads generated from Variable.

Variable's call database confirms that it provided leads to State Farm agents for at least 62,827 unique cellular telephone numbers during the relevant period. Remarkably, State Farm agents continued to employ Variable's services for *over six months* after Plaintiffs filed this case. State Farm finally notified its agents that it no longer approved of their use of Variable for telemarketing on September 26, 2013; Variable shut its doors only a few days thereafter. Because Defendants did not obtain Plaintiffs' prior express consent to receive these calls—a fact that is undisputed—they violate the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*.

---

[1] For purposes of this Motion, "State Farm" refers only to the corporate entity that is the Defendant in this case; it does not refer to the network of insurance agents who sell insurance products under the State Farm umbrella and branding (who are referred to hereafter as "State Farm agents").

Plaintiffs seek certification of a Class defined as persons who received automated telephone calls on their cellular telephones, and whose lead information was transferred to agents of State Farm, between January 1, 2012 and September 29, 2013 ("Class" and "Class Period"). Plaintiffs also seek certification of a "willfulness" subclass defined as persons who received the above phone calls, and whose lead information was transferred to agents of State Farm, between April 24, 2013—the date a subpoena was issued to Variable in this case—until September 26, 2013 ("Subclass").

As Judge Easterbrook observed, class certification is routinely granted in TCPA litigation. *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("Class certification is normal in litigation under [the TCPA]. . . ."). Where, as here, Plaintiffs present a precisely defined, carefully circumscribed class consisting only of those individuals who received calls traceable to State Farm, who could not and did not consent to receiving them, class certification is particularly appropriate.

As detailed below, the proposed Class and Subclass are ascertainable; satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy; and satisfy the Rule 23(b)(3) requirements of predominance and superiority. For these reasons, Plaintiffs respectfully seek certification under Rule 23(b)(3) of the Class and Subclass. In addition, or in the alternative, Plaintiffs respectfully seek certification of the Class and Subclass against Variable under Rule 23(b)(1), and of the issue of vicarious liability against both defendants under Rule 23(c)(4). Plaintiffs also request that the Court appoint them as Class Representatives, and that Rule 23(g) interim class and liaison counsel be appointed as Class Counsel.

Classwide factual issues commonly disputed in many TCPA cases have already been clarified in the discovery process here. Variable's own records demonstrate that: (1) Plaintiffs, like other members of the proposed Class, received automated prerecorded telemarketing calls from Variable to their cell phones; and (2) those leads were provided to State Farm agents, either through a "warm transfer" of the phone call or electronically. Here, unlike some TCPA class cases, there is no need to piece together an imprecise class list from multiple sources; class discovery yielded a single database, hidden for a time in Morocco by Variable's principal, containing the contact information for all class members resulting from Variable's interactions with the class members. The file, which was continually and contemporaneously updated by Variable, chronicles all call transfers to State Farm agents, and when each transfer occurred. The Class is limited to persons who received calls from Variable (confirmed through outbound call records obtained through discovery) and whose leads were provided to State Farm agents. The "willfulness" Subclass, similarly, is limited to persons who received calls from Variable *after this case had already been filed and after it was indisputably on notice of the wrongfulness of its conduct*. Persons (1) who are not on the outbound call lists obtained in discovery, and (2) whose lead was not provided to State Farm, are excluded from the Class and Subclass. Additionally, there are no individualized issues relating to prior express consent: Variable engaged in a "cold call" process based on the White Pages, and no defendant contends that there was "prior express written consent" for any call.

Therefore, the core legal and factual questions to be resolved in this case are straightforward and, indisputably, common to the Class as a whole: whether the calls contained "prerecorded messages" as defined in the TCPA, whether State Farm is

- 3 -

vicariously liable under the TCPA for calls made by Variable that resulted in leads transferred to State Farm agents, and whether any violations were willful or knowing. 47 U.S.C. § 227(b)(1)(A)(iii). Answering these questions will determine in one stroke whether State Farm and Variable are liable to the Class as a whole. Because damages are statutory, the amount of State Farm's liability, if any, will implicate no individual issues: it is just math.

Plaintiffs submit that if class certification is "normal" in TCPA cases generally, this case presents a paradigmatic candidate for class certification. They respectfully request that the Court grant their motion.

## II.    BACKGROUND

### A.    The Telephone Consumer Protection Act

Congress enacted the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") to prevent autodialed and prerecorded calls by companies that escaped state invasion of privacy and nuisance statutes by operating interstate. *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 745 (2012). Unlike many federal statutes, Congress embedded the reasons for the TCPA into the statute itself with explicit Congressional Findings. 105 Stat. 2394, §§ 10, 12, 14 (notes following 47 U.S.C. § 227). *Mims* explicitly cited these Congressional Findings in noting that "'automated or prerecorded telephone calls' . . . were rightly regarded by recipients as 'an invasion of privacy.'" *Id.* (citing 105 Stat. 2394). Accordingly, Congress found that:

> ***Banning such automated or prerecorded telephone calls*** to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, ***is the only effective means of protecting telephone consumers*** from this nuisance and privacy invasion.

- 4 -

*Id.* at § 12 (emphasis added). Indeed, as the United States Supreme Court recently held in a different context, "Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" *Riley v. California*, 134 S. Ct. 2473, 2494-95 (2014) (citing *Boyd v. United States*, 116 U.S. 616, 630 (1886)). "The TCPA is essentially a strict liability statute … [t]he TCPA does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (citation omitted).

Congress vested the Federal Communication Commission ("FCC") with authority to issue regulations implementing the TCPA. 47 U.S.C. § 227(b)(2). The FCC has observed that Congress enacted a prohibition on automated or prerecorded calls to cell phones in order "to protect telephone users 'from unwanted communications that can represent annoying intrusions into daily life,'" noting that while Congress did not expect the TCPA to inhibit desired business communications, it "specifically targeted autodialed and prerecorded calls because it considered such calls to be 'a greater nuisance and invasion of privacy than calls placed by 'live' persons.'" Ex. A, Letter Brief of Federal Communications Commission ("FCC Brief") at 2-3, *Nigro v. Merchantile Adjustment Bureau, LLC*, No. 13-1362 (2d Cir. June 30, 2014) (citations omitted). [2]

The burden is on the ***calling party***, i.e. the defendant, to demonstrate that it obtained the prior express consent of the called party. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd.

---

[2] All exhibit citations in this Memorandum refer to exhibits attached to the Declaration of Daniel M. Hutchinson in Support of the Motion for Class Certification.

7961, 30 F.C.C.R. 7961 (F.C.C. 2015) ("2015 FCC Ruling"), at ¶ 47 ("Moreover, we emphasize that regardless of the means by which a caller obtains consent, under longstanding Commission precedent, if any question arises as to whether prior express consent was provided by a call recipient, the burden is on the caller to prove that it obtained the necessary prior express consent.") (emphasis added).  Under the Hobbs Act, 28 U.S.C. § 2342, all FCC rulings are binding on this Court because the Federal Courts of Appeals have exclusive jurisdiction over challenges to FCC rulings.  *Indiana Bell Tel. Co. v. McCarty*, 362 F.3d 378, 389 n.13 (7th Cir. 2004).

### B. Variable's Automated Call Practices

Variable used automated dialers to place telemarketing calls to consumers.  Ex. B, Deposition of Jeffrey Schaffer ("Schaffer Dep."), 239:1-240:20 ("Everybody knew the leads were generated from telemarketing").  Variable utilized a true sequential dialing system: it obtained phone numbers from the White Pages, and then Variable's system was programmed to dial each potential ten digit number that could serve as a telephone number, without any prior information as to the person associated with that number.  Ex. C, Hansen Report, ¶¶ 21-22; Ex. D, Hansen Rebuttal Report, ¶ 20; *see also* Ex. B, Schaffer Dep. at 161:7-13.[3]  In essence, the recipients of these calls were, by design, "random" individuals who had no previous connection with Variable or State Farm.  For

---

[3] Mr. Hansen specializes in investigating and analyzing electronic data.  He has extensive experience with data warehousing, and has personally used, assembled, configured, customized, maintained, and operated all aspects of autodialers.  His expertise has been acknowledged in similar TCPA cases.  *See, e.g.*, *Booth v. Appstack, Inc.*, No. C13–1533 JLR, 2015 WL 1466247 (W.D. Wash. Mar. 29, 2015).  His qualifications are further set forth in his reports.  Ex. C, Hansen Report, ¶¶ 4-12 & Ex. A; Ex. E, Hansen Supp. Report, ¶¶ 5-12 & Ex. A; Hansen Rebuttal Report, ¶¶ 4-11; Ex. F, Hansen Supp. Written Report, ¶¶ 4-11.

this reason, Variable did not even attempt to obtain the prior express consent of the persons it called. *See* Ex. B, Schaffer Dep. at 39:17-21 (confirming that Variable "numbers were called regardless of whether number was . . . mobile or landline, or whether prior express consent was obtained").

Every Variable outbound call contained a prerecorded message informing the recipient of an opportunity to save on their car insurance. *See* Ex. B, Schaffer Dep. at 159:15-17 ("There would be a prerecorded message."); 48:12-13 ("Only one recording was used for all calls."); *see also* Ex. G (transcript of call recording).

### C. Lead Transfers to State Farm Agents

Variable made money by contracting with insurance agents to sell "live leads"—essentially, transferred calls with callers on the line who had "pressed 1" during the pre-recorded message—who met certain criteria, pre-defined by the business needs of the contracting insurance agents. *See* Ex. B, Schaffer Dep. at 36:3-9. Standard contracts between Variable and the agents specify: "CLIENT also agrees to allow vendor to advertise on his/her behalf and accepts all liability for said advertising. ***CLIENT agrees that he/she has permission to advertise/telemarket for the insurance carrier/agency specified***." Ex. H, Schaffer Dep., Ex. G (VM000026-29) (emphasis added). Variable's standard practice was to review the fine print of the contract with each customer. Ex. B, Schaffer Dep., 63:14-23. These standard, uniform contracts did not change during the class period. *Id.* at 49:12-50:8.

Variable made millions of outbound autodialer calls using four vendors: Sales Technologies, InterCloud9, Sigma Voice/Shoutpoint and yTel. Ex. I, Schaffer Dep. at 295:19-298:12, 324:22-329:23, 340:10-341:10, 390:21-391:14, 397:1-397:10; *see also*

- 7 -

Ex. F, Hansen Supp. Written Report, ¶ 15.  When a called party "Pressed 1," she was connected with a live person at Variable, known as a "screener."  Ex. B, Schaffer Dep. at 102:15-20.  The screener asked the potential lead a series of personal and demographic questions essential to developing an insurance quote—name, address, phone number, vehicle information, homeowner status, and driving record.  *Id.* at 102:15-103:1.  The screener then "matched" the caller with an insurance agent who had contracted with Variable to purchase leads matching the demographics gathered.  *Id.*  During the class period, Variable provided only one lead to a single agent.  *Id.* at 57:21-25; 66:8-10; 125:12-22; 166:7-21.[4]

With each call transfer, the State Farm agent simultaneously received all the personal and demographic information that Variable collected.  *Id.*  The insurance agent received the lead information even if the "warm transfer" was unsuccessful.  *Id.*  Using this information, State Farm agents attempted to sell State Farm insurance to each class member.

Variable maintained as accurate a database as possible of leads transferred to State Farm agents.  *Id.* at 165:20-166:6.  This database contained all of the personal and demographic information obtained by Variable's screener, at the request of State Farm agents, and the identity of the agent to whom Variable transferred the lead.  Ex. J, Variable Response to RFP Nos. 9 & 17; Ex. E, Hansen Supp. Report ¶17.  According to Variable's records, it transferred 112,074 unique live leads to insurance agents as a result

---

[4] On September 30, 2013, Variable distributed a large number of leads to fulfill its existing contracts before going out of business.  Ex. B, Schaffer Dep. at 66:18-67:14; 166:22-167:25.  Because some leads on that date—and only that date—may have been distributed to multiple agents, Plaintiffs have eliminated September 30, 2013 from the Class Period out of an abundance of caution.  *See* Ex. D, Hansen Rebuttal Report ¶ 32.

of calls made to cellular telephones.  Ex. D, Hansen Rebuttal Report ¶ 52.  Of those,

Variable transferred 71,549 leads from 71,342 unique wireless numbers to State Farm

agents.  *Id.*  Plaintiffs' expert compared Variable's outbound autodialer records and leads

database; and "determine[d] that all the phone numbers in the Variable database received

a call from an autodialer with the exception of 8,515 unique phone numbers.  Ex. F,

Hansen Supp. Written Report ¶ 17.[5]

> ### D.    State Farm Allowed its Agents to Use Variable and Ratified their Contracts through Direct Contact.

Variable contracted with State Farm agents.  State Farm—corporate State Farm—

played a key role in orchestrating and ratifying the arrangement between Variable and

State Farm's agents.  Variable shut its doors on September 30, 2013, after State Farm sent

a blast email to its agents and employees suggesting that State Farm no longer approved

of using Variable.  *See* Ex. K, VM000398.

> ### 1.    State Farm Relied on its "Exclusive Agency Relationship" with its Agents to Make Telemarketing Calls to Consumers.

State Farm long relied on the telemarketing efforts of its agents. In May 2005,

State Farm requested that the FCC, the federal agency charged with interpreting and

enforcing the TCPA, issue a declaratory ruling permitting State Farm's agents to make

telemarketing calls to consumers listed on the National Do Not Call Registry if State

Farm (not the agent making the call) had an established business relationship with such

consumer.  *See* Ex. L, *State Farm Mutual Automobile Insurance Company's Request for

Clarification & Declaratory Ruling,* CG Docket No. 02-278, (May 13, 2005).

---

[5] Additional outbound Call Detail Reports from InterCloud9 and Sales Technologies are being pursued in discovery.  Plaintiffs expect that the remaining 8,515 numbers will be accounted for in this call data.  Ex. E, Hansen Supp. Written Report ¶ 17.

- 9 -

State Farm stated that it relies "almost entirely" on insurance agents who have an "*exclusive agency relationship*" with State Farm, to "represent the company to consumers and provide service to policyholders." *Id.* (emphasis added). State Farm admitted that State Farm "itself conducts no telemarketing and delegates almost all policyholder communications to local State Farm agents." *Id.*[6] After summarizing its close relationship with its agents, State Farm stated that its agents "perform the same services for State Farm as employees do for companies that happen to in-source, rather than out-source, customer service functions." *Id.* Accordingly, State Farm petitioned the FCC to treat its agents essentially as employees.

The FCC granted State Farm's request for a Declaratory Ruling and, in August of 2005, issued a Declaratory Ruling in which it clarified that State Farm's "exclusive agents" could contact consumers listed on the DNC Registry in reliance on the TCPA's Established Business Relationship exemption.[7] The FCC, however, *explicitly warned* that State Farm would be responsible if the telemarketing practices of its agents to the extent that they were otherwise in violation of the TCPA. Specifically, the FCC cautioned:

> We take this opportunity to reiterate that a company on whose behalf a telephone solicitation is made bears the ultimate responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of the company are treated as if the company itself placed the call.

---

[6] State Farm also admitted that "[a]gents solicit applications for coverage, submit claims, and in some cases, have draft authority to pay claims on the spot." *Id.*

[7] *See In The Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991: Request of State Farm for Clarification and Declaratory Ruling,* 20 FCC Rcd 13664, 13666-13668 (FCC 2005), attached hereto as Ex. L.

- 10 -

*Id.* State Farm did not heed the FCCs' warning, even after this case was filed. Rather, State Farm encouraged its "exclusive" agents to telemarket in violation of the TCPA, and knowingly accepted leads derived from Variable calls for *over six more months*.

### 2. State Farm Encouraged its Agents and Employees to Use Telemarketing Vendors, Allowing Over 500 of Them to Use Non-Approved Variable.

State Farm and its agents were aware that Variable engaged in telemarketing to generate leads. Aside from the fact that it was aware of this lawsuit, State Farm has explicitly encouraged its agents to engage in broad telephone solicitation:

> *As you are all aware marketing and cold calling for new business is what we have been encouraged to do to grow our business. Buying leads or having companies call for us has been normal...*What I think each you should know is that a new agent in Los Alamos Abe Dispennette is using a marketing firm that is marketing to the whole state. I have had several call to individuals in my area and one even to a team member. The company calls cell phones and does not differentiate with towns or cities and when you return the call it's a Santa Fe number.

*See* Ex. N, VM1666-1669 (emphasis added). Additionally, State Farm agents knew that Variable used pre-recorded technology. As one State Farm agent inquired of Variable in the fall of 2012, "Is everything working ok? We haven't gotten any leads. Also my sister just got a phone call (I am pretty positive from y'all), *pressed the right number for a quote* and no one picked up." *See* Ex. O, VM2233-4 (emphasis added).

Variable's business model epitomized the type of telemarketing the TCPA was designed to prevent, as Variable engaged in a "cold calling" telemarketing campaign. *See* Ex. B, Schaffer Dep. at 184:6-10. Variable used an autodialer. *See* Ex. C, Hansen Report ¶¶ 21-22, 31-49. Each of Variable's calls also used a message that had been recorded ahead of time. Variable contacted tens of millions of individuals to locate "live leads" for State Farm. *See* Ex. E, Hansen Supp. Report ¶¶ 17-19.

- 11 -

From its inception, Variable sought to provide leads to State Farm and its agents. Variable's business grew through a State Farm referral system, including State Farm "sales leaders," who are employees of State Farm who manage 30 or 40 State Farm agents. Specifically, in exchange for receiving free leads from Variable, State Farm employees and agents worked with Variable to recruit others to hire Variable. *See* Ex. P, VM001995.

Not only did State Farm encourage use of telemarketing vendors, it knew its agents were using the "non-approved" Variable, and kept accepting leads obtained through Variable anyway. State Farm Vice Presidents Michael Hargis and Wroten, along with other State Farm Bloomington-based marketing and public relations brass, had a "high importance" discussion about the effectiveness, propriety and legality of Variable in January 2013. Ex. Q, SMITHJEN00099245PROD, at 4. As part of this email chain, State Farm Agency Field Executive Lorenzo Bailey urged agent Traci Williams not to research Variable. *Id.* at 3. Also as part of this chain, Marketing Strategist Fernando Dominguez forwarded the entire email string to the "Tactical Strategist" team, and a discussion ensued that ultimately resulted in an email from Tracy Sapp at State Farm headquarters in Bloomington, Illinois. She warned recipients that Variable is "not an approved vendor," and that legal was taking action on Variable's use of the State Farm logo. *Id.* at 1. State Farm apparently elected not to instruct, suggest, or request that its agents cease and desist working with Variable, and elected not to ask Variable to cease and desist working with its agents at that time.

Over the course of its relationship with State Farm, Variable contracted with approximately **504** State Farm employees and agents.

- 12 -

### 3. State Farm Ratified its Agents' Contracts with Variable through Direct Contacts with Variable.

Because State Farm devoted a large portion of its budget to marketing, State Farm agents were the majority of Variable's client base. Ex. B, Schaffer Dep. at 69:6-10; 169:6-12. State Farm actively promoted the Variable service to its agents, including facilitating meetings between Variable and the agents. Schaffer Dep. at 248:13-249:9.[8] In the words of Variable's head, "State Farm agents tend to very much follow the flock." Schaffer Dep. at 71:20-21. Therefore, once State Farm agents had success selling insurance through Variable leads, other agents followed suit. Ex. B, Schaffer Dep. at 71:20-72:7. State Farm knew that Variable was using its corporate name as part of its calling program, as well as in Variable's marketing materials. Ex. B, Schaffer Dep. at 239:24-240:24. Ex. Q, SMITHJEN00099245PROD, at 1.

Despite the fact that high-level State Farm employees and executives knew that Variable was non-approved, State Farm agency field executives recommended Variable's services to State Farm agents and tracked the number of leads generated from Variable. Ex. R, SMITHJEN00073941PROD; Ex. B, Schaffer Dep. at 245:3-15, 248:7-12, 250:24-251:5, 251:23-252:1, 253:7-12, 254:12-20, 255:6-8, 257:11-19. State Farm even subsidized the contracts between Variable and State Farm agents through additional funds paid to agents for telemarketing. Ex. T, State Farm Supplemental Discovery Responses, Response to Plaintiffs' Interrogatory No. 11.[9]

---

[8] *See also* Ex. R, SMITHJEN00073941PROD; Ex. Q, SMITHJEN00099245PROD, and Ex. S (G-Mail Live Leads).
[9] State Farm served these supplemental interrogatory responses at 4:59 p.m. on Friday, February 26, 2016, two business days before the class certification motion deadline.

- 13 -

### E.    Background of Plaintiffs' Claims

#### 1.    Plaintiff Jennifer Smith

On January 25, 2013, Plaintiff Jennifer Smith received a telephone call on her cellular telephone from telephone number 773-xxx-6086.  Ex. U, Smith Decl ¶ 4.[10] When Smith answered the call, a prerecorded message played that told Smith that she could save on her auto insurance.  *Id.* ¶ 5.  Plaintiff Smith initially hung up, but called back at later the same day in order to identify the source of the call.  *Id.* ¶ 6.  Plaintiff Smith was eventually connected to a live operator, who solicited customer information from Plaintiff Smith and informed her that, if she provided this information, she would be transferred to a State Farm agent.  *Id.* ¶ 7.

This lawsuit was filed on March 15, 2013.  Dkt. No. 1.

On August 12, 2013 (five months after the initial filing of this action), Plaintiff Smith received a call from 312-854-0140 consisting of the same pre-recorded message as provided during the January call.  Ex. U, Smith Decl. ¶ 10.  After remaining on the line through the automated prompts, Plaintiff Smith was connected to a Variable screener, who eventually transferred her call to David Olchowka, a State Farm agent located in Elk Grove, Illinois.  *Id.* ¶ 12; Ex. W, Plaintiffs' Discovery Responses, Response to Interrogatory No. 1.  Mr. Olchowka received the Variable lead data, and after a discussion with Ms. Smith, issued Plaintiff Smith a quote for State Farm auto insurance. *Id.*

---

[10] Plaintiffs Smith and Matejovich more fully recount the facts and circumstances surrounding these calls in the Declarations attached to this Memorandum as Exhibits V and W.

### 2. **Plaintiff Shawn Matejovich**

On August 9, 2013, Plaintiff Shawn Matejovich received a telephone call on his cellular telephone from telephone number 614-656-4949.  Ex. V, Matejovich Decl. ¶ 4. Mr. Matejovich did not answer the call, and the Variable message was left on his voicemail.  *Id.*  Mr. Matejovich received two additional, identical calls from Variable, displaying the same caller ID number, within the next over the next four days.  *Id.* ¶ 5.

On August 10, 2013, Mr. Matejovich called 614-656-4949, in an attempt to discover the source of—and stop—the calls.  *Id.* ¶ 6.  After passing through the automated, "Press 1," menu, Mr. Matejovich was connected to a Variable customer service representative, who attempted to solicit information in preparation for an auto insurance quote.  *Id.* ¶ 6-7.  When Mr. Matejovich asked the customer service representative to identify her employer and to stop making automated calls, the customer service representative disconnected the call.  *Id.* ¶ 7.

On August 15, 2013, Mr. Matejovich again called 614-656-4949.  *Id.* ¶ 8.  After being connected to a customer service representative, he provided the requested car insurance-related information, and was transferred to a State Farm insurance agent in Westerville, Ohio.  *Id.* ¶ 9.  This State Farm agent provided Mr. Matejovich an insurance quote over the phone and via email.

## III.    LEGAL STANDARD

Class certification is proper if Plaintiffs satisfy the requirements of Rule 23(a) and one of the prongs of Rule 23(b).  The purpose of Rule 23 is to provide for the efficient administration of justice, as the class action mechanism allows large numbers of claims involving the same core issues to proceed in the aggregate, providing a path to relief

- 15 -

where otherwise there would be none. "Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010).

"Class certification is normal in litigation under [the TCPA]." *Ira Holtzman, C.P.A.,* 728 F.3d at 684; *see also Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*, No. 09-c-07299, 2014 WL 540250, at *15, n. 11 (N.D. Ill. 2014) ("*Chapman I*"), *leave to appeal denied* 747 F.3d 489 (7th Cir. 2014) ("*Chapman II*") (Posner, J.) (discussing "the many cases decided during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases"). These holdings are consistent with the Supreme Court's observation that the class certification requirements are "readily met" in consumer protection cases where, as here, common factual questions necessarily center upon the defendant's course of conduct. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

In order to certify a class, Plaintiffs must demonstrate that they meet the requirements of Rule 23. This requirement has three parts. First, as a threshold requirement, Courts have held that the representative Plaintiffs must demonstrate that: (1) they have standing; and (2) the proposed class is ascertainable, *i.e.*, defined clearly and based on objective criteria. *See, e.g., Kohen v. Pacific Inv. Mgmt. Co., LLC,* 571 F.3d 672, 676 (7th Cir. 2009) ("as long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."); *Birchmeier v. Caribbean Cruise Line, Inc.,* 302 F.R.D. 240, 245 (N.D. Ill. 2014) (citing *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Oshana v. Coca-Cola Co.,* 472

- 16 -

F.3d 506, 513 (7th Cir. 2006) (ascertainability); *Mullins v. Direct Digital, LLC*, 795 F.3d

654, 663 (7th Cir. 2015) (discussing ascertainability requirement).

Second, a proposed class must meet all of the requirements of Rule 23(a):

"(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation."

*Kleen Products LLC v. International Paper,* 306 F.R.D. 585, 589 (N.D. Ill. 2015) (citing

*Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012)).  Finally,

the proposed class must qualify as one of the types described in Rule 23(b).  *Id.*  In this

case, Plaintiff seeks certification under Rule 23(b)(3), which "requires the court to find[ ]

that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy," *Suchanek v.*

*Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014) (quoting the Rule) (internal

quotation marks omitted).

## IV.    ARGUMENT

### A.    The Proposed Class

Plaintiffs seek certification under Rule 23(b)(3) of a Class consisting of:

> persons who received automated telephone calls on their
> cellular telephones, and whose lead information was
> transferred to agents of State Farm, between January 1,
> 2012 and September 29, 2013.

Plaintiffs also seek certification of a "willfulness" Subclass consisting of:

> persons who received the above phone calls, and whose
> lead information was transferred to agents of State Farm,
> between April 24, 2013—the date a subpoena was issued to
> Variable in this case—until September 26, 2013.

The proposed Class and Subclass meet all requirements for certification.

- 17 -

**B.     The Class Representatives Have Standing.**

Plaintiffs received calls on their cellular telephones from Variable and were each

transferred to State Farm agents.  Ex. D, Hansen Rebuttal Report, ¶¶ 36-37, 39-44; Ex. F,

Hansen Supp Written Report, ¶ 18.  Plaintiffs allege that those calls violated the TCPA,

which provides for statutory damages to the call recipient.  As such, Plaintiffs have

properly alleged: (1) an injury-in-fact (the invasion of privacy caused by the unwanted

calls); (2) stemming from Defendants' unlawful conduct (the automated calls in violation

of the TCPA); and (3) that the injury may be redressed (via the statutory TCPA

damages).  Plaintiffs thus have standing to represent the proposed Class and Subclass.

**C.     The Proposed Class is Ascertainable.**

"Rule 23 requires that a class be defined, and experience has led courts to require

that classes be defined clearly and based on objective criteria."  *Mullins*, 795 F.3d at 659.

In a detailed and thorough opinion on the topic, the Seventh Circuit in *Mullins* recently

explained that ascertainability is only focused on the class definition itself, explicitly

rejecting the application of a "heightened" or "stringent" version of ascertainability in

which courts consider administrative feasibility.  The Court explained that a proposed

class may fail to meet the ascertainability requirement in three ways.  First, classes

"defined too vaguely fail to satisfy the 'clear definition' component."  *Id.*  In other words,

"class definitions generally need to identify a particular group, harmed during a particular

time frame, in a particular location, in a particular way."  *Id.* at 660.  Second, the

ascertainability requirement will not be satisfied where classes "are defined by subjective

criteria, such as by a person's state of mind…."  *Id.*   "Third, classes that are defined in

terms of success on the merits—so-called 'fail-safe classes'—also are not properly

- 18 -

defined . . . .  The key to avoiding this problem is to define the class so that membership does not depend on the liability of the defendant." *Id.*

Plaintiffs' proposed Class consists only of individuals who meet three criteria: (1) they received a call made by Variable to their cellular telephone; (2) it was received between the dates of January 1, 2012, and September 29, 2013; and (3) a lead was transferred to a State Farm agent.  This represents "a particular group, harmed during a particular time frame, in a particular location, in a particular way," and thus avoids the problem of a vague class definition.  *See Mullins*, 795 F.3d at 660.   In addition, all three of these elements are evaluated based entirely on objective criteria: an individual either received a call from Variable or he or she did not; the call occurred during the relevant time period or it did not; and the call was transferred to a State Farm agent or it was not. Finally, the definition does not depend on, or presuppose, any liability for these calls on the part of State Farm, and thus it is not a "fail safe" class.  As such, the proposed Class and Subclass are ascertainable.

Moreover, the Class here is not only ascertainable; Plaintiffs' expert, using call and lead data obtained through discovery from the Variable database, has in fact identified the (at least) 62,827 persons who comprise the Class.  Ex. F, Hansen Supp. Written Report, ¶ 17.  Acquiring the lead data from Variable's business records located in Morocco was consistent with this Court's prior instruction regarding ascertainability when State Farm moved to strike the Plaintiffs' class allegations:

> Here, State Farm argues that the class definition is "fail-safe" because its members necessarily depend on a future decision on the merits—namely, which calls Variable made "on behalf of" State Farm. As Plaintiffs note, however, they may be able to obtain information in discovery that clearly shows which calls Variable made on State Farm's behalf. It may be that Variable, State Farm, or a third party maintained records that identify

- 19 -

> which Variable calls were directed to State Farm agents. The Amended
> Class Action Complaint also alleges that Variable kept track of the leads it
> sent to State Farm. (R. 153, Am. Consol. Compl. ¶ 105.) Simply put,
> Plaintiffs need additional discovery to determine the extent to which they
> can link calls made by Variable to State Farm.

*Smith v. State Farm Mut. Auto. Ins. Co.*, 2015 U.S. Dist. LEXIS 5231, *12 (N.D. Ill.

Jan. 13, 2015).

Unlike many TCPA cases, Plaintiffs have not merely identified the phone

numbers called. *Cf. Birchmeier,* 302 F.R.D. at 248 ("[I]t is fairly clear that the identities

of the persons whose numbers are on plaintiffs' list of 930,000—indeed, the subscribers

for those numbers at the time defendants called them—are sufficiently ascertainable.").

Instead, Plaintiffs have the precise contact information for each class member, including

their names, addresses, and telephone numbers.

Relying on a belt-and-suspenders approach, Plaintiffs are further able to ascertain

the Class's membership through two additional sources. First, Plaintiffs verified the call

data by obtaining the raw call data from Variable's phone service providers to confirm,

independently, the Variable calls that resulted in a lead transfer to State Farm. Ex. C,

Hansen Report, ¶¶ 17-19; Ex. E, Hansen Supp. Report, ¶ 28; Ex. D, Hansen Rebuttal

Report, ¶¶ 41, 53 & Ex. F (listing a sample of such calls from December 2012); Ex. F,

Hansen Supp. Written Report, ¶ 17 (confirming outgoing calls to at least 62,827 unique

numbers in the Variable leads database). Second, State Farm possesses a Prospector+

database of leads from which Plaintiffs' expert can trace some of the leads that agents

obtained through Variable. Ex. C, Hansen Report, ¶27-29; Ex. E, Hansen Supp. Report,

¶¶ 29-31; Ex. D, Hansen Rebuttal Report, ¶¶ 54-56. To whatever extent ascertainability

remains an "element" of Rule 23 or requirement for certification, Plaintiffs have met it.

1271132.9

### D.     The Requirements of Rule 23(a) Are Met.

A proposed class must meet all of the requirements of Rule 23(a), which are "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Kleen Products*, 306 F.R.D. at 589. The proposed class meets all four of these requirements.

### 1.     The Proposed Class is Sufficiently Numerous.

A class is numerous if it is large enough "that joinder of all parties is impractical." Fed. R. Civ. P. 23(a)(1). As this Court has previously found in the TCPA context, "[a] class of forty generally satisfies the numerosity requirement. *See Savanna Group, Inc. v. Trynex, Inc.,* No. 10-cv-7995, 2013 WL 66181, *4 (N.D. Ill. Jan. 4, 2013) (St. Eve, J.). Numerosity is determined prior to any consideration of whether a particular class member has a valid claim. *See Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.") (emphasis in original).

According to Variable's records, outgoing calls to at least 62,827 unique numbers were transferred to State Farm agents by Variable between January 1, 2012 and September 29, 2013. Ex. D, Hansen Rebuttal Report, ¶ 52; Ex. F, Hansen Supp. Written Report, ¶ 17. Thus, the class consists of at least 62,827 individuals across the country. *Id.* This is more than sufficient to satisfy the numerosity requirement.

### 2.     The Proposed Class Involves Common Issues of Law and Fact.

"One of the requirements for a class action in federal court is the existence of questions of law or fact common to the class." *Suchanek,* 764 F.3d at 755 (quoting Rule 23) (internal quotation marks omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a

- 21 -

common question." *Id.* at 756 (citing *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th

Cir. 2010)). "The Supreme Court has explained that 'for purposes of Rule 23(a)(2) even

a single common question will do.'" *Id.* at 755 (quoting *Wal–Mart Stores, Inc. v. Dukes,*

131 S. Ct. 2541, 2556 (2011)).

A class plaintiff must show that the matter "is capable of classwide resolution—

which means that determination of its truth or falsity will resolve an issue that is central

to the validity of each one of the claims in one stroke." *Dukes,* 131 S. Ct. at 2551.

Because by definition large automated calling programs are carried out on a mass basis, a

proposed TCPA class often contains common issues of law and fact. *See G.M. Sign, Inc.*

*v. Finish Thompson, Inc.,* No. 07 C 5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20,

2009) (collecting cases).

The same is true here. All of the calls at issue in this case were made: (1) to

cellular telephone numbers; (2) using an artificial or prerecorded voice; and (3) without

the prior express consent of the called party—issues of fact to be proved by evidence

common to every class member. *See* Schaffer Dep, at 39:17-21 (confirming that Variable

"numbers were called regardless of whether number was . . . . mobile or landline, or

whether prior express consent was obtained") & 48:12-12 ("Only one recording was used

for all calls."). Using this common evidence in conjunction with the evidence of State

Farm's actions, or inactions, as it related to Variable prior to the Class Period, a merits

determination will be able to be made as to all class members if State Farm is vicariously

liable for the telemarketing activities of Variable that ended up as leads for State Farm

agents. Similarly, whether Variable's calls constitute "willful" or "knowing" violations

of the TCPA—particularly calls made after this case had been filed and Defendants

- 22 -

therefore indisputably had knowledge of the wrongfulness of their conduct—is a legal issue that can be determined on a classwide basis.

Given these common issues, Plaintiff has articulated a "common nucleus of operative fact" that links all class members' claims together. *See Savanna Group,* 2013 WL 66181, at *8 (St. Eve, J.).   The proposed Class satisfies the requirements of Rule 23(a)(2).

Should liability be found, damages are simply math: in light of the statutory damages provisions of the TCPA, damages can be straightforwardly calculated by multiplying the number of calls received by the statutory penalty.  Each plaintiff's measure of damages can readily be determined on a classwide basis.

### 3.    Plaintiffs' Claims Are Typical of Those of the Class.

"'[T]ypicality' reflects the Rule 23(a)(3) requirement that 'the claims or defenses of the representative parties [be] typical of the claims or defense of the class.'"  *Chicago Teachers Union, Local 1 v. Board of Educ. of the City of Chicago,* 307 F.R.D. 475, 480-81 (N.D. Ill. 2015).  "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory." *Id.* (quoting *Oshana,* 472 F.3d at 514).  Put another way, where the defendant engages "in a standardized course of conduct vis-a-vis the class members, and plaintiffs' alleged injury arises out of that conduct," typicality is "generally met." *Hinman v. M and M Rental Center*, 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) (citing, *e.g.*, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)).  "This requirement 'directs the district court to focus on whether the named representatives' claims have the

- 23 -

same essential characteristics as the claims of the class at large.'" *Birchmeier,* 302

F.R.D. at 251 (quoting *Muro v. Target Corp.,* 580 F.3d 485, 492 (7th Cir. 2009)).

Here, the standardized course of conduct consists of (1) Variable making

automated calls to cellular telephones in violation of the TCPA; and (2) Variable

transferring leads arising out of such calls to State Farm agents. The representative

Plaintiffs, just like everyone in the Class, received calls on their cellular telephones

between January 1, 2012 and September 29, 2013, and were transferred to a State Farm

agent for an insurance quote (either "warm" or by data). Their claims thus flow from the

same conduct that produced the calls and transfers for all the other members of the

proposed class; their claims are therefore typical of those of the Class. As this Court has

previously found in the TCPA context, "The putative class members' claims also arise

from the same legal theory—that Defendants violated the TCPA by sending faxes

without the express consent or permission of the intended recipients." *See Savanna*

*Group,* WL 66181, at *11. Rule 23(a)(3) is satisfied.

### 4.        Plaintiffs and their Counsel are Adequate.

"Rule 23(a)(4) requires that the named plaintiffs and class counsel 'will fairly and

adequately protect the interests of the class.'" *Birchmeier,* 302 F.R.D. at 252 (quoting the

Rule). When conducting an adequacy analysis, the Court considers "the adequacy of the

named plaintiffs as representatives of the proposed class's myriad members, with their

differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592

(7th Cir. 2011). While the Supreme Court has noted that adequacy and typicality analysis

"tend[ ] to merge," *Amchem ,*521 U.S. at 626 n. 20 (1997), courts have rejected proposed

class representatives due to "conflicts of interest" or "serious credibility problems." *Birchmeier,* 302 F.R.D. at 252 (internal quotation marks and citations omitted).

Plaintiffs have no interests that are antagonistic to the Class, and there is no indication of any credibility or other problems with any proposed class representative. *See* Ex. U, Smith Decl. ¶¶ 14-16; Ex. V, Matejovich Decl. ¶¶ 11-13. Plaintiffs have committed to achieving the best result for all members of the Class, and have received no money or other compensation in return for serving as a class representative. Their interests are aligned precisely with those of the class.[7]

### E. The Rule 23(b)(3) Requirements Are Satisfied.

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating of the controversy." *Birchmeier,* 302 F.R.D. at 252, 255 (quoting the rule) (internal quotation marks omitted). Here, common questions predominate over individual issues and the class action device is superior to other methods of adjudication.

### 1. Common Issues Predominate

Predominance is "readily met" in certain consumer cases. *Amchem*, 521 U.S. at 625. The touchstone for predominance analysis in the Seventh Circuit is efficiency. *Butler v. Sears, Roebuck and Co.,* 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *vac'd on other grounds*, 133 S. Ct. 2768 (2013), *judgment reinstated*, 727 F.3d 796 (7th Cir.

---

[7] Pursuant to the 2003 amendments to Rule 23, the qualifications of Plaintiffs' counsel are assessed under subsection (g) of the rule, and therefore are addressed below. *See infra* Sec. V.

- 25 -

2013) ("*Butler II*"), *cert. denied*, 134 S. Ct. 1277 (2014). "[T]he requirement of predominance is not satisfied if 'individual questions . . . overwhelm questions common to the class.'" *Butler II,* 727 F.3d at 801 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013)). On the flip side, it is not the case that *every* issue must be common to *every* class member, as "a rule requiring 100% commonality would eviscerate consumer-fraud class actions." *Suchanek,* 764 F.3d at 759. "[P]redominance is [not] determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler II*, 727 F.3d at 801. "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Id.* (quoting *Dukes,* 131 S. Ct. at 2551).

In addition, as the Supreme Court has held, while Rule 23(b)(3) requires a showing that *questions* common to the class predominate, it does not require proof that those questions will be answered, on the merits, *in favor of* the class. *Amgen*, 133 S. Ct. at 1191. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Id.* Whether or not this case is ultimately decided in favor of the class, its resolution will be determined by answering questions common to all class members.

TCPA claims, by their nature, involve large numbers of plaintiffs who received identical calls; a single defendant (or small number of defendants); and a common course of conduct that affected each plaintiff in the same way. As discussed above in connection with the commonality requirement under Rule 23(a)(2), Plaintiffs have identified common issues that arise from Defendants' common course of conduct and are suitable

for class adjudication, including the central issue in this case: State Farm's vicarious liability for Variable's automated telemarketing practices after it had previously been sued for the same telemarketing campaign, and allowed it to continue. In contrast, Plaintiffs do not anticipate *any* individualized issue that Defendants could raise, let alone enough of them to justify a decision not to certify a class. This is true for several reasons.

First, in many TCPA cases defendants attempt to show that class members provided "prior express consent" to receive autodialed calls, and some courts have found that the question of prior express consent is an individualized issue that defeats the predominance requirement. *E.g., Balschmiter v. TD Auto Finance, LLC,* 303 F.R.D. 508, 527-29 (E.D. Wisc. 2014). The issue of prior express consent simply does not exist here, since Defendants can make no good faith argument that they received prior express consent of even a single member of the class. As the autodialer records make clear, the calls were made using a "sequential number generator." Hansen Report at ¶ 21. This means that autodialers employed by Variable were programmed to dial every potential telephone number within a given area code or other range. *Id.* at ¶ 22. Thus, at the time the calls were made, Variable did not even know who the person was on the other end of the line; it certainly did not have (or attempt to get) that person's prior express consent to receive autodialed calls. Variable confirmed this fact during its deposition. *See* Schaffer Dep, at 39:17-21 (confirming that Variable "numbers were called regardless of whether number was . . . . mobile or landline, or whether prior express consent was obtained"). For this reason, Variable and State Farm have no prior express consent defense as to any member of the proposed class.

Second, if Plaintiffs' proposed Class is certified, the central remaining issue in the case—whether or not State Farm is vicariously liable for the actions of Variable and the State Farm agents—is a question that can only be resolved on a class-wide basis.  It is a binary question:  State Farm either is, or is not, vicariously liable for the calls made on its behalf by Variable.  The answer will not—cannot—vary class member to class member.

It is undisputed that State Farm agents hired Variable to generate leads, that Variable made millions of outbound calls, and that Variable transferred a subset of those leads to State Farm agents.  State Farm agents kept track of which leads came from Variable in a database State Farm corporate maintained, and State Farm issued quotes for such insurance during the pendency of this lawsuit.  High-level State Farm executives and persons responsible for State Farm marketing knew about agents' use of Variable's telemarketing services before this case was filed; despite having the ability to exercise control over the relationship between State Farm and Variable, State Farm declined to do so until six months after this case was filed.  Finally, during the pendency of this lawsuit State Farm has knowingly retained the benefit of Variable's allegedly illegal telemarketing: discovery has not revealed any attempt by State Farm to purge the business, or the lead information, it and its agents obtained through Variable's allegedly illegal calls.

Whether Variable's calls fall within the TCPA and to what extent State Farm is liable for the calls made by Variable depend on the relationship between Variable, State Farm, and the State Farm agents; the liability question has nothing to do with individual class members.  Thus, the multitude of common issues presented by the proposed Class

- 28 -

predominates over individual issues, if there even are any. The predominance portion of Rule 23(b)(3) is satisfied.

### 2.    A Class Action Is the Superior Method of Adjudicating the Claims of the Class Members.

The second prong of the analysis under Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); Fed. R. Civ. P. 1 (noting that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). "Class certification is usually considered a superior method of adjudicating claims involving standardized conduct, even if there are individual issues that exist among class members (for example, on questions such as damages) . . . ." *Cicilline v. Jewel Food Stores, Inc.,* 542 F. Supp. 2d 831, 838 (N.D. Ill. 2008). Where there is a "breadth and importance of the common issues" in the case, "'the superiority requirement . . . poses no serious obstacle to class certification.'" *Kleen Products,* 306 F.R.D. at 606 (quoting *Messner*, 669 F.3d at 814 n.5).

Unsurprisingly, courts routinely find class actions to be the superior method of adjudicating TCPA claims. *See, e.g. Hinman,* 545 F. Supp. 2d at 807 ("It also appears that resolution of the issues on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources."); *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.,* 281 F.R.D. 327, 339 (E.D. Wis. 2012) ("Providing evidence of the defendant's alleged violation of the TCPA, as it relates to this specific class, would be duplicated in each individual lawsuit if the action were not

- 29 -

allowed to proceed as a class. This runs counter to the objective of class actions to provide efficiency for the parties and the courts.").  As one federal court recently found while certifying a TCPA case:

> Jurists and commentators have long debated the merits of the modern class action and the public policies behind Rule 23…It is the view of this Court that the instant case highlights one of the strongest justifications for the class action device: its regulatory function…A statute such as the TCPA, which provides for a relatively small recovery for individual violations but is designed to deter conduct directed against a large number of individuals, can be effectively enforced only if consumers have available a mechanism that makes it economically feasible to bring their claims. Without the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.

*Bee, Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 630 (S.D. Cal. 2015).

Indeed, as this Court is aware, Plaintiffs engaged in extensive discovery efforts to obtain appropriate discovery from Variable, its principal Jeffrey Schaffer, and its vendors.  (*See, e.g.*, Dkt. 168, 173, 181, 188, 196, 199, 234.)  Forcing individual class members to repeat these years-long discovery efforts in individual proceedings would not be superior to class treatment.

Moreover, this case does not present any of the manageability problems that impact the superiority determination.  In particular, providing notice to class members—which occasionally proves an obstacle to class certification under the TCPA—can be easily accomplished in this case because Plaintiffs will be able to generate an accurate list of class members using the records obtained in discovery.  *See Mullins*, 795 F.3d at 667 (holding that questions related to the accuracy and usability of proposed class lists should be analyzed in the context of the superiority requirement).  The database maintained by Variable and obtained by Plaintiffs contains a listing of every lead transferred to a State

- 30 -

1271132.9

Farm agent, when the lead was transferred, and the contact information (name, address and telephone number) for that lead. As such, Plaintiffs already possess a list of class members, and should the Court certify the proposed Class, notice could quickly and efficiently be sent to class members using that list. Thus, the proposed Class meets the superiority requirement of Rule 23(b)(3).

### F.    Certification Under Rule 23(b)(1) and/or 23(c)(4) Is Appropriate.

Under Rule 23(b)(1), a class may be certified if:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(1). Thus, subsection A attempts to avoid possible prejudice to the defendants, while subsection B is concerned with prejudice to the putative class members. Where, as here, Variable has closed its doors and has limited resources, treatment under Rule 23(b)(1) is particularly appropriate. *See* Advisory Committee Notes, Rule 23(b)(1) (finding that it is "plainly the case" that "adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit" "when claims are made by numerous persons against a fund insufficient to satisfy all claims."). Indeed, the "the limited fund class action" has been described as "(b)(1)(B)'s paradigmatic case." *Newberg on Class Actions* § 4:24 (5th ed. 2012). Plaintiffs therefore

- 31 -

seek Rule 23(b)(1) certification as to Variable.

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The Seventh Circuit recently observed: "It is not hard to frame liability issues suited to class-wide resolution." *In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) (citing Fed. R. Civ. P. 23(c), *Butler,* 727 F.3d at 800, and *Pella Corp.,* 606 F.3d at 393-94 (per curiam)). "If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012). Plaintiffs' request for Rule 23(c)(4) certification—to seek classwide declaratory relief finding that State Farm is vicariously liable for Variable's calls—is precisely the type of issue best suited for classwide determination.

## V.    APPOINTMENT OF CLASS COUNSEL

The Court previously appointed Jonathan Selbin of Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB") as interim lead class counsel and Alexander H. Burke of Burke Law Offices, LLC ("Burke Law") as interim liaison class counsel. Dkt. No. 101.

Plaintiffs request that their counsel be appointed as Class Counsel for this action. Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class

- 32 -

actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class."

LCHB and Burke Law are "qualified, experienced, and generally able to conduct the proposed litigation." Counsel are experienced class action practitioners, fully versed in the intricacies of class actions in general and TCPA class actions in particular. Ex. X, Selbin Decl. ¶¶ 3-8; Ex. Y, Burke Decl., ¶¶ 3-6. Counsel have resolved dozens of similar TCPA cases, including three of the four largest cash settlements in the 24-year history of the TCPA. Ex. X, Selbin Decl. ¶¶ 3-8; Ex. Y, Burke Decl. ¶¶ 3-6. Accordingly, Plaintiffs ask that their counsel be appointed co-lead class counsel on behalf of any class that is certified.

## VI. <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed Class and Subclass against Variable and State Farm under Rule 23(b)(3). In addition, or in the alternative, Plaintiffs respectfully ask the Court to certify the Class and Subclass against Variable under Rule 23(b)(1), and to certify the issue of vicarious liability against both defendants under Rule 23(c)(4).

- 33 -

Dated:  March 1, 2016           By:  _/s/ Jonathan D. Selbin _____
                                          Jonathan D. Selbin

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Jonathan D. Selbin (*pro hac vice*; admitted to the N.D. Ill. general bar)
Email:  jselbin@lchb.com
Douglas I. Cuthbertson (*pro hac vice*; admitted to the N.D. Ill. general bar)
Email: dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Daniel M. Hutchinson (*pro hac vice*; admitted to the N.D. Ill. general bar)
Email:  dhutchinson@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

*Lead Counsel for Plaintiffs and the Proposed Class*

BURKE LAW OFFICES, LLC
Alexander H. Burke
Email: ABurke@BurkeLawLLC.com
155 N. Michigan Avenue, Suite 9020
Chicago, IL  60601
Telephone:  (312) 729-5288
Facsimile:   (312) 729-5289

*Liaison Counsel for Plaintiffs and the Proposed Class*

BRODERICK LAW, P.C.
Edward A. Broderick (pro hac vice)
ted@broderick-law.com
Anthony Paronich (pro hac vice)
anthony@broderick-law.com
125 Summer Street, Suite 1030
Boston, MA 02360
Telephone:  (508) 221-1510

LAW OFFICE OF MATTHEW MCCUE
Matthew McCue (pro hac vice)
Email: mmccue@massattorneys.net
1 South Ave, Suite 3
Natick, MA 01760
Telephone:  (508) 655-1415

- 34 -

MEYER WILSON CO., LPA
Matthew R. Wilson (Ohio State Bar No. 0072925;
admitted to the N.D. Ill. general bar)
Email: mwilson@meyerwilson.com
Michael J. Boyle, Jr. (Ohio State Bar No. 0091162;
admitted to the N.D. Ill. general bar)
Email: mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066

EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Dulijaza Clark
120 S. LaSalle Street, Suite 1800
Chicago, IL 60603-3593
Telephone (312) 739-4200
Facsimile: (312) 419-0379

*Additional Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2016, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


By:   /s/ *Jonathan D. Selbin*
　　　　Jonathan D. Selbin